1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CONNIE GAIL RODRIGUEZ,        ) Case No. EDCV 13-1357-JPR
                              )
              Plaintiff,      )
                              )
          vs.                 ) MEMORANDUM OPINION AND ORDER
                              ) AFFIRMING THE COMMISSIONER
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of        )
Social Security,              )
                              )
              Defendant.      )
                              )

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed April 7, 2014, which the Court has taken under submission without oral argument. For the reasons discussed below, the Commissioner's decision is affirmed and judgment is entered in her favor.

**II.   BACKGROUND**

Plaintiff was born on August 26, 1957.  (AR 28, 121.)  She worked for many years as a truck driver and manager of fast-food restaurants.  (AR 29-30, 192.)

On March 10, 2010, Plaintiff filed an application for DIB. (AR 42, 121-22.)  She alleged that she had been unable to work since May 31, 2009, because of back pain, low platelets, lumbar pain, degenerative disc disease, facet arthropathy,[1] and bilateral lower extremity radiculopathy.[2]  (AR 121, 171.)  After Plaintiff's application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 47-59.)

A hearing was held on February 15, 2012, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE").  (AR 24-41.)  In a written decision issued May 25, 2012, the ALJ determined that Plaintiff was not disabled.  (AR 11-19.)  On June 27, 2012, Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 6.)  On June 6, 2013, the council denied the request.  (AR 1-3.)  This action followed.

---

[1]Facet arthropathy is degenerative arthritis affecting the facet joints in the spine.  Carol Eustice, Facts about Facet Arthropathy, About.com (June 27, 2014), http://arthritis. about.com/od/spine/p/facet_joints.htm.

[2]Radiculopathy is "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root."  Radiculopathy, Merriam-Webster, http://www.merriam-webster.com/dictionary/radiculopathy (last accessed July 30, 2014).

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

3

(9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform her past work; if so, the claimant

_____

[3]RFC is what a claimant can do despite existing exertional

1  is not disabled and the claim must be denied.

2  § 404.1520(a)(4)(iv).  The claimant has the burden of proving she

3  is unable to perform past relevant work.  Drouin, 966 F.2d at

4  1257.  If the claimant meets that burden, a prima facie case of

5  disability is established.  Id.  If that happens or if the

6  claimant has no past relevant work, the Commissioner then bears

7  the burden of establishing that the claimant is not disabled

8  because she can perform other substantial gainful work available

9  in the national economy.  § 404.1520(a)(4)(v).  That

10  determination comprises the fifth and final step in the

11  sequential analysis.  § 404.1520; Lester, 81 F.3d at 828 n.5;

12  Drouin, 966 F.2d at 1257.

13      B.   The ALJ's Application of the Five-Step Process

14      At step one, the ALJ found that Plaintiff had not engaged in

15  any substantial gainful activity since May 31, 2009, her alleged

16  onset date.  (AR 13.)  At step two, she concluded that Plaintiff

17  had the severe impairments of "degenerative disc disease of the

18  lumbar spine; essential thrombocytopenia;[4] hypertension and

19  dyspnea."  (Id.)  The ALJ determined that Plaintiff's depression

20  _____

21  and nonexertional limitations.  20 C.F.R. § 404.1545; see Cooper

    v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

22

23      [4]Thrombocytopenia is any disorder with an abnormally low
    amount of platelets, which are parts of the blood that help blood

24  to clot.  Thrombocytopenia, MedlinePlus, http://www.nlm.nih.gov/
    medlineplus/ency/article/000586.htm (last updated Feb. 24, 2014).

25  This condition is sometimes associated with abnormal bleeding.
    Id.  On March 16, 2010, Dr. Ram Chillar, who specialized in

26  hematology and oncology, noted that Plaintiff's thrombocytopenia
    was "modest" with "minimal evidence of bleeding" but recommended

27  that she not undergo any invasive procedure without prior
    authorization because she might first need a "platelet

28  transfusion."  (AR 259-61.)

                                 5

and anxiety were not severe, findings Plaintiff does not challenge. (AR 14-15.) At step three, she determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (AR 15.) At step four, the ALJ found that Plaintiff had the RFC to perform a limited range of light work,

> which permits lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours in an 8 hour day; and standing/walking 6 hours in an 8 hour day except she needs to alternate positions at one hour intervals for one to five minutes at the work station. She can occasionally kneel, stoop, crawl and crouch and occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. She has no restriction on the use of her hands. The claimant would need to use a single point cane for prolonged walking or walking on uneven or moving surfaces. She would be able to sustain concentration, attention, persistence and pace in at least 2 hour blocks of time to complete a normal workday and would be able to interact appropriately with coworkers, supervisors and the general public.

(Id.) Based on the VE's testimony, the ALJ concluded that Plaintiff was able to perform her past relevant work as a fast-food manager. (AR 19.) Accordingly, the ALJ determined that Plaintiff was not disabled. (Id.)

**V. DISCUSSION**

Plaintiff claims the ALJ erred in assessing (1) the opinion of her treating physician and (2) her credibility. (J. Stip. at

3-4.)

A.   <u>The ALJ Did Not Err in Evaluating Plaintiff's Treating</u>
     <u>Physician's Opinion</u>

Plaintiff contends that the ALJ erred in according reduced weight to the assessment of her treating physician, Dr. Donald D. Kim.  (<u>Id.</u> at 4-10.)

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's

1  area of specialization, and other factors.  § 404.1527(c)(2)-(6).

2  When a treating doctor's opinion is not contradicted by some

3  evidence in the record, it may be rejected only for "clear and

4  convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec. Admin.,

5  533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at

6  830-31).  When a treating physician's opinion is contradicted,

7  the ALJ must provide only "specific and legitimate reasons" for

8  discounting it.  Id.

9      2.  Relevant facts[5]

10  On October 9, 2009, Dr. Kim, who was board certified in

11  orthopedic surgery, noted that Plaintiff complained of severe

12  back pain that did not radiate and which was worse after

13  activity, repetitive use, walking, lifting, bending, climbing

14  stairs, and prolonged sitting or standing.  (AR 257.)  Plaintiff

15  took Motrin for pain, which improved her symptoms.  (Id.)  Upon

16  examination, Dr. Kim noted that Plaintiff was "full weight

17  bearing" with normal balance, no gross muscle weakness, and no

18  tremors.  (AR 256-57.)  Flexion of her thoracolumbar spine was

19  decreased to 70 out of 90 degrees, but her extension, lateral

20  bending, and rotation were normal and she had no muscle spasm.

21  (Id.)  Plaintiff had tenderness at L4-5 on the right, but

22  straight-leg-raising tests were negative in the sitting and

23  supine positions.[6]  (Id.)  Dr. Kim diagnosed chronic lower back

24  _____

25  [5]Because the parties are familiar with the facts, they are

26  summarized here only to the extent relevant to the contested
    issues.

27  [6]Straight-leg-raising tests are done to help find the reason

28  for low-back and leg pain.  Straight-Leg Test for Evaluating Low
    Back Pain, WebMD, http://www.webmd.com/a-to-z-guides/straight-

pain, "probable discogenic";[7] bilateral lower-extremity radiculopathy; L2-5 degenerative disc disease; and severe right L4-5 facet arthropathy.  (AR 255.)  He prescribed Darvocet[8] and recommended that she undergo three right-lumbar epidural injections and three facet-block injections at L4-5.  (Id.)

On October 30, 2009, Dr. Kim noted Plaintiff's complaints of severe back pain that "radiates into the buttocks, hip, leg." (AR 254.)  Plaintiff reported that her symptoms, which included stiffness, stabbing pain, tenderness, and tingling, were aggravated by prolonged sitting and standing, walking, bending, and climbing stairs but improved with medication.  (Id.)  Dr. Kim noted that Plaintiff was "full weight bearing" and was using a TENS unit,[9] limiting activities, and taking Darvocet for "pain

leg-test-for-evaluating-low-back-pain-topic-overview (last updated Dec. 14, 2011).  A positive test means that one or more of the nerve roots leading to the sciatic nerve may be compressed or irritated.  Id.

[7]"Discogenic" means caused by derangement of an intervertebral disk.  Discogenic, The Free Dictionary, http://medical-dictionary.thefreedictionary.com/discogenic (last accessed July 28, 2014).

[8]Darvocet was a painkiller containing propoxyphene, which was used to relieve mild to moderate pain.  Darvon, Darvocet Banned, WebMd, http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned (Nov. 19, 2010); Propoxyphene, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html (last updated Feb. 1, 2011).  The FDA banned Darvocet and other drugs containing propoxyphene in October 2011.  Darvon, Darvocet Banned, WebMd, http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned (Nov. 19, 2010).

[9]A Transcutaneous Electrical Nerve Stimulator ("TENS") is "[a] technique used to relieve pain in an injured or diseased part of the body in which electrodes applied to the skin deliver intermittent stimulation to surface nerves, blocking the transmission of pain signals."  The American Heritage Dictionary

management."  (Id.)  She had normal balance, no gross muscle weakness, and no tremors.  (AR 253.)  Flexion of the thoracolumbar spine was reduced to 70 out of 90 degrees, and she had tenderness at the right L4-5, but all other ranges of motion were normal, and straight-leg-raising tests were negative in the sitting and supine positions.  (Id.)  Dr. Kim prescribed Darvocet, noted that they were "still awaiting authorization" for the lumbar injections, and opined that Plaintiff was "[d]isabled" until February 1, 2010.  (AR 252.)

On December 14, 2009, Dr. Kim noted that Plaintiff reported moderate to severe pain that radiated into her buttocks and hip. (AR 251.)  She stated that her symptoms improved with medication and were aggravated by walking and prolonged sitting and standing.  (Id.)  Dr. Kim found that Plaintiff was "full weight bearing" and had normal balance, no gross muscle weakness, and no tremors.  (AR 250-51.)  Her range of motion of the thoracolumbar spine was normal in all planes.  (Id.)  Plaintiff had tenderness of the mid-lower back, but straight-leg-raising tests were negative.  (AR 250.)  Dr. Kim noted that the epidural and facet-block injections had been authorized and would be scheduled soon; prescribed Darvocet and Flexeril;[10] and noted that Plaintiff was "[d]isabled" until February 1, 2010, "with possible extension."

---

1794 (5th ed. 2011).

[10]Flexeril, or cyclobenzaprine, is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Cyclobenzaprine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last updated Oct. 1, 2010).

(AR 249.)

On January 26, 2010, Dr. Kim noted that Plaintiff complained of moderate to severe pain that radiated into her buttocks, hip, and leg. (AR 248.) Her symptoms were worse with squatting, walking, bending, and prolonged sitting and standing, and they improved with medication. (Id.) For pain management, Plaintiff was using a TENS unit in addition to her medication. (Id.) Dr. Kim found that Plaintiff's lower back was tender, especially on the right, but she was full weight bearing and had normal balance, no gross muscle weakness, and no tremors. (AR 247-48.) He stated that Plaintiff was a truck driver but was "unable to sit or stand for a long period of time" and "unable to work due to her severe pain." (AR 247.) He noted that Plaintiff would schedule epidural and facet-block injections, prescribed Vicodin[11] and Flexeril, and opined that she was disabled until April 26, 2010. (Id.)

On March 17, 2010, Dr. Kim noted that Plaintiff complained of moderate to severe back pain that radiated into the buttocks and hips. (AR 245.) Plaintiff reported that her symptoms, which included "tingling, stabbing pain, numbness, [and] tenderness," were aggravated by repetitive use, kneeling, squatting, walking, bending, lifting, climbing stairs, and prolonged sitting and standing, and they improved with medications. (Id.) Dr. Kim found that Plaintiff was "[t]ender at bilateral L5-S1" and her

---

[11]Vicodin contains a narcotic pain reliever, hydrocodone, and a nonnarcotic pain reliever, acetaminophen. Vicodin oral, WebMD, http://www.webmd.com/drugs/ drug-3459-vicodin+oral.aspx (last accessed July 28, 2014). It is used to relieve moderate to severe pain. (Id.)

flexion was "45 degrees." (AR 244.) She was full weight bearing and had normal balance, no gross muscle weakness, and no tremors. (AR 244-45.) Dr. Kim noted that a recent routine physical examination had shown that Plaintiff had a "[d]ecreased platelet count," and he diagnosed "[t]hrombocytopenia, unclear etiology." (AR 244.) He opined that Plaintiff would be disabled until July 19, 2010, and noted that she would apply for Social Security benefits when her state disability benefits ran out. (Id.) Dr. Kim recommended that Plaintiff postpone epidural and facet-block injections "until after platelet count is back up to normal," and he prescribed Vicodin and Flexeril. (AR 244.)

On May 24, 2010, Dr. Kim noted that Plaintiff complained of severe back pain that radiated to her buttocks and hip. (AR 397.) Plaintiff reported that her symptoms, which included "stiffness and stabbing," were worse with pushing, pulling, kneeling, squatting, repetitive use, reaching overhead, walking, stair climbing, lifting, bending, and prolonged sitting and standing. (Id.) They improved with medication. (Id.) Dr. Kim found that Plaintiff was "full weight bearing" and had normal balance, no gross muscle weakness, and no tremors. (AR 397-98.) He noted that Plaintiff "appear[ed] uncomfortable," was tender in the right sacroiliac region,[12] had "a positive Fabere sign,"[13] and

---

[12]The sacroiliac joint is in the low back, where the spine meets the pelvis. Debra Wood, RN, Sacroiliac Joint Pain,(last updated May 2014), available at http://medicine.med.nyu.edu/conditions-we-treat/conditions/sacroiliac-joint-pain.

[13]The Patrick, or Fabere, test is a test for pain or dysfunction in the hip and sacroiliac joints. Patrick Test, The Free Dictionary, http://medical-dictionary.thefreedictionary.com/Patrick+test (last accessed July 28, 2014).

had an "antalgic gait on the right." (AR 398.) He noted that Plaintiff's spleen was enlarged and that he could not perform the epidural and facet-block injections because her platelet count was still low. (Id.) He noted that "Vicodin is no longer helping, so she will try Vicodin ES and Flexeril"; she also had "new pain involving the sacroiliac region" and therefore "has difficulty walking and she needs a handicapped placard for six months." (Id.) In addition to his prior diagnoses, Dr. Kim diagnosed right-sacroiliac pain. (Id.)

On June 10, 2010, Dr. D.A. Haaland, who specialized in orthopedics,[14] reviewed Plaintiff's medical records and completed a physical-RFC assessment. (AR 311-15.) Dr. Haaland listed Plaintiff's diagnoses as moderate thrombocytopenia, moderate splenomegaly, and degenerative disc disease at L2-5. (AR 311.) He opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for about six hours and sit for about six hours in an eight-hour day, and perform unlimited pushing and pulling. (AR 312; see also AR 310 (opining that Plaintiff was capable of "light work").) Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but she could never climb ladders, ropes, or scaffolds. (AR 313.)

On August 23, 2010, Dr. Kim noted that Plaintiff reported

---

[14]Dr. Haaland's electronic signature includes a medical specialty code of 29, indicating orthopedics. (AR 310, 315); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms. nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

severe back pain radiating to her buttocks and hip.  (AR 395.)
She reported that her symptoms, which included "stiffness and
stabbing," were constant and worse with repetitive use, prolonged
standing, walking, climbing stairs, and bending.  (Id.)  They
improved with "medications and no activity."  (Id.)  Plaintiff
was full weight bearing and had normal balance, no gross muscle
weakness, and no tremors.  (AR 395-96.)  Dr. Kim found that
Plaintiff had lumbosacral and right-posterior-sacroiliac
tenderness, a "Patrick's [test was] strongly positive causing
pain in the right groin," and "[o]n the left heel, she [was]
tender directly at the calcaneal tuberosity."  (AR 396.)  His
diagnoses included "[p]ossible left heel pain, possible calcaneal
spur."  (Id.)  Dr. Kim noted that Plaintiff was "still
thrombocytopenic and the cause is not known," and "[b]ecause of
that, she cannot have epidural injections or any surgical
intervention."  (Id.)  He noted that Plaintiff had right
sacroiliac pain and had "difficulty walking and standing," and he
recommended chiropractic treatments twice a week for four weeks.
(Id.)  Dr. Kim prescribed Vicodin and Flexeril and recommended
"Tuli heel cups" for her left-heel pain.  (Id.)  Dr. Kim also
noted that Plaintiff had "applied for Social Security disability
and she was turned down," and he recommended that she appeal
because she "cannot stand at a fast food restaurant working
because of pain in her lower back, as well as the right
sacroiliac pain and now she has developed heel pain."  (Id.)  He
further noted that "[t]he fact that she has thrombocytopenia, she
cannot have any type of invasive procedures and therefore, she
really is permanently disabled in a way."  (Id.)

1    On September 22, 2010, Dr. Paulette M. Harar, who
2  specialized in pediatrics,[15] reviewed Plaintiff's medical records
3  and "affirm[ed] the prior RFC of light with some postural
4  limitations by Dr. Haaland." (AR 317.)

5    On October 4, 2010, Dr. Kim noted that Plaintiff reported
6  "severe" back pain that radiated to her buttocks and hip. (AR
7  392.) Plaintiff reported that her symptoms, which included
8  "clicking, popping and stiffness," worsened with stair climbing,
9  bending, prolonged sitting, and walking and improved with heat,
10 no activity, and medication. (Id.) She had not undergone any
11 chiropractic treatments because she could not afford the copay.
12 (Id.) Dr. Kim found that Plaintiff had normal balance, no gross
13 muscle weakness, and no tremors. (AR 393.) Her gait was
14 "sightly antalgic on the right," and she was "tender in the right
15 sacroiliac region with a positive Fabere." (Id.) He noted that
16 Plaintiff "really should see a chiropractor because her problem
17 seems to be the sacroiliac joint" and that she required "daily
18 use of extra-strength Vicodin and Flexeril and she has difficulty
19 sleeping at nighttime because of her pain." (Id.) Dr. Kim also
20 noted that Plaintiff "may need pain management evaluation and
21 treatment." (Id.)

22   On November 15, 2010, Dr. Kim noted that Plaintiff
23 complained of "[b]ack, right hip and leg pain" and that her

24

25    [15]Dr. Harar's electronic signature includes a medical
26 specialty code of 32, indicating pediatrics. (AR 317); see
   Program Operations Manual System (POMS) DI 26510.089, U.S. Soc.
27 Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.
   nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin.
28 (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

symptoms, which included "clicking, stiffness and catching," were
"constant and worsening." (AR 389.)  Plaintiff's symptoms were
aggravated by walking, stair climbing, and prolonged sitting and
standing and improved with "no activity and medication." (<u>Id.</u>)
He noted that Plaintiff was fully weight bearing and had normal
balance, no gross muscle weakness, and no tremors. (AR 389-90.)
She had "tenderness mostly at the right sacroiliac region with a
positive Faber [sic] test," and her "gait was slightly antalgic
on the right." (AR 390.)  Dr. Kim noted that Plaintiff had not
seen a chiropractor because of the copay, and he refilled her
prescriptions for Vicodin and Flexeril. (AR 391.)  He further
noted that Plaintiff "has a hearing for Social Security
Disability" and "has a note from her attorney what functional
limitations [sic]." (<u>Id.</u>)  Dr. Kim opined that Plaintiff was
"unable to lift ore [sic] than ten pounds, and she can
occasionally bend or stoop but not frequently"; "[p]rolonged
standing, walking and sitting for more than fifteen minutes are
difficult"; "[s]he has difficulty reaching overhead"; and "[s]he
used her husband's cane, which helped with the right hip pain at
the right sacroiliac joint." (<u>Id.</u>)

　　　　On January 3, 2011, Dr. Kim noted that Plaintiff complained
of "severe back pain that radiates to his [sic] buttock, hip and
leg." (AR 386.)  Plaintiff's symptoms, which included "clicking,
popping, stiffness, stabbing and catching," were "constant and
worsen after activity and with prolonged sitting, prolonged
standing and walking." (<u>Id.</u>)  Her symptoms improved with "no
activity and medication." (<u>Id.</u>)  Dr. Kim noted that Plaintiff
was full weight bearing and had normal balance, no gross muscle

weakness, and no tremors. (AR 386-87.) Her lumbar spine was "tender with limited range of motion," and her left thumb was tender over one joint. (AR 387.) He diagnosed, in addition to his previously diagnosed conditions, "[p]ossible thumb MCP joint synovitis versus arthritis." (Id.) Dr. Kim noted that Plaintiff was "still not a candidate for epidural injections nor any surgery" because of her thrombocytopenia. (AR 388.) He noted that Plaintiff had been "turned down twice" and "has a hearing for SSI," and he opined that she "still remains substantially limited due to her back pain which has very limited treatment options due to her thrombocytopenia." (Id.) Dr. Kim refilled Plaintiff's medications. (Id.)

On February 14, 2011, Dr. Kim noted that Plaintiff complained of severe back pain that radiated to her buttock, hip, and leg. (AR 384.) Plaintiff's symptoms, which included "stiffness, stabbing, weakness and catching," were worse with activity but improved with "heat, no activity, and medication." (Id.) He noted that Plaintiff had "difficulty changing positions, due to her back pain," and that her "lumbar spine is tender with limited flexion." (AR 385.) Dr. Kim further noted that "[b]ecause of the thrombocytopenia, we cannot do epidural injections or any invasive procedures." (Id.) He refilled her medication, encouraged her to use her TENS unit, and noted "[p]ossible pain management treatment." (Id.)

On March 28, 2011, Dr. Kim noted that Plaintiff complained of severe back pain. (AR 381.) Her symptoms, which included "popping, stiffness and stabbing," worsened with activity and prolonged sitting or standing and improved with "heat, no

17

activity and medication." (<u>Id.</u>)  He noted that Plaintiff was full weight bearing and had normal balance, no gross muscle weakness, and no tremors.  (AR 381-82.)  Dr. Kim found that Plaintiff's lumbar spine was tender with limited motion, and her right thumb was slightly tender over one joint.  (AR 382.)  He noted that "nothing invasive can be done at this time for her low back pain" because of her "low platelet count," opined that she was "disable [sic] for an additional six weeks," refilled her medications, and noted "[p]ossible pain management referral." (AR 383.)

On May 9, 2011, Dr. Kim noted that Plaintiff complained of severe back pain that radiated into her back, lower back, hip, and leg.  (AR 378.)  Her symptoms, which included "clicking and stiffness," worsened with activity and at night and improved with "use of heat, no activity and medications."  (AR 378.)  Dr. Kim found that Plaintiff was "full weight bearing" and had normal balance, no gross muscle weakness, and no tremors.  (AR 378-79.) She was "tender in the midline at L5-S1," her "[f]lexion [was] 70 degrees with difficulty getting up from a flexed postion," her "[e]xtension [was] 10 degrees," and her "[l]ateral bending [was] 10/10 degrees."  (AR 379.)  He observed that "[s]ince the last visit, [Plaintiff] has been checked and diagnosed with hypothyroidism," and she was "tired and she sleeps all day." (<u>Id.</u>)  He noted that Plaintiff could not have "any type of injection because of her thrombocytopenia," refilled her medication, noted "[p]ossible referral for pain management," and opined that she was "totally disabled at this time for another six weeks."  (AR 380.)

18

On June 22, 2011, Dr. Kim noted that Plaintiff complained of severe back pain that radiated to her back, buttocks, and hip. (AR 375.)  Her symptoms, which included "clicking" and "stabbing pain," were "constant" and worsened with walking or bending and improved with the use of heat and medications.  (Id.)  Plaintiff had normal balance, no gross muscle weakness, and no tremors. (AR 376.)  Her lumbar spine was tender and flexion was limited to 45 degrees.  (Id.)  Dr. Kim again noted that Plaintiff could not have injections because of her thrombocytopenia.  (AR 377.)  He refilled her prescription for Vicodin, prescribed Soma,[16] and opined that Plaintiff was disabled for "another three months." (AR 376-77.)

On August 26, 2011, Dr. Kim noted that Plaintiff complained of severe right-hip and back pain that radiated to her back, buttocks, hip, and leg.  (AR 373.)  Her symptoms, which included "popping" and "catching," were constant and worse with activity, walking, climbing stairs, and prolonged sitting and standing. (Id.)  They improved with heat, no activity, and medication. (Id.)  Dr. Kim found that Plaintiff was "full weight bearing" with normal balance, no gross muscle weakness, and no tremors. (AR 374.)  Her lumbar spine was tender with limited motion. (Id.)  Dr. Kim refilled Plaintiff's medications, noted that her "back pain is chronic and it is not expected to improve," and

---

[16]Soma, or carisoprodol, is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Carisoprodol, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html (last updated Aug. 1, 2010).

stated that she was "disabled for an additional three months" and could not have "any type of injections or for [sic] her back pain because of her thrombocytopenia." (Id.)

On October 26, 2011, Dr. Kim noted that Plaintiff complained of severe right-back and hip pain. (AR 428.) Her symptoms, which included "locking, popping, stiffness, [and] stabbing pain," were "constant" and worse with activity, prolonged sitting, and climbing stairs and improved with the use of heat and medication. (Id.) Dr. Kim found that Plaintiff was "full weight bearing" and had normal balance, no gross muscle weakness, and no tremors. (AR 428-29.) Her flexion of the lumbar spine was reduced to 45 degrees, her extension was 10 degrees, and she had tenderness at L4-5 and L5-S1 at the midline. (AR 429.) Dr. Kim refilled Plaintiff's medications and opined that "[b]ased on her back problems and all of her medical problems she really is temporarily totally disabled for an additional three months and probably on a permanent basis." (Id.)

On March 1, 2012, Dr. Kim noted that Plaintiff had severe back pain that radiated into her buttocks and hip. (AR 433.) Her symptoms, which included "clicking, stabbing pain, [and] catching," were aggravated by repetitive use and prolonged sitting or standing and improved with "use of heat, elevation, no activity, [and] medications." (Id.) He noted that Plaintiff had normal balance, no gross muscle weakness, and no tremors. (Id.) Plaintiff had tenderness at L4-5 and L5-S1, her forward flexion was 45 degrees, and her extension was 10 degrees. (AR 434.) Dr. Kim noted that he "cannot do anything invasive for her" and refilled her medications. (Id.)

3.   <u>Discussion</u>

     The ALJ accorded "low weight" to Dr. Kim's opinion of Plaintiff's functional limitations and "greater weight" to Dr. Haaland's because the latter was "more consistent with, and better supported by, the evidence when considered in its entirety." (AR 17-18.) The ALJ also noted that Dr. Kim's findings of disability were conclusory and his opinion regarding Plaintiff's functional limitations was unsupported by the evidence and his own treatment notes, conflicted with Plaintiff's reports of her daily activities, and was inconsistent with his prescribed conservative care. (AR 16-18.) For the reasons discussed below, remand is not warranted because the ALJ gave specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Kim's controverted opinion.

     As an initial matter, the ALJ permissibly discounted Dr. Kim's finding that Plaintiff was "disabled" because it was a "conclusory opinion" and "not an assessment as to an actual functional capacity." (AR 17.) Indeed, such findings are reserved to the ALJ, and a doctor's opinion that a claimant is disabled is not entitled to any special weight. <u>See</u> § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (treating-source opinions that a person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); <u>see also</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 885 (9th Cir. 2010) (as amended) ("A disability is an administrative determination of how an

21

impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity."). The ALJ therefore was not obligated to accept Dr. Kim's conclusion that Plaintiff was disabled.

The ALJ also permissibly discounted Dr. Kim's opinion because "the limitations [he] reported . . . are not justified by the evidence as a whole, nor by his own examination findings which are primarily subjective tenderness and limited range of motion in her spine." (AR 17); see § 404.1527(c)(4) (explaining that more weight should be afforded to medical opinions that are consistent with the record as a whole); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); Houghton v. Comm'r Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012) (holding that ALJ's finding that doctors' opinions were "internally inconsistent, unsupported by their own treatment records or clinical findings, [and] inconsistent with the record as a whole" constituted specific and legitimate bases for discounting them). Indeed, in his November 2010 note, Dr. Kim found that Plaintiff was so debilitated by her orthopedic conditions that it was difficult for her to sit, stand, or walk for more than 15 minutes and she was unable to lift more than 10 pounds. (AR 391.) But those findings appear to be based primarily on Plaintiff's subjective complaints of pain and tenderness, because the only arguably objective findings reflected in his notes were limited flexion and extension of the lumbar spine; a positive Patrick test, indicating a hip problem;

22

and a "slightly" antalgic gait on the right.[17]  As the ALJ noted, moreover, Dr. Kim repeatedly found that Plaintiff was fully weight bearing, with normal balance and no gross muscle weakness or tremors, and Plaintiff consistently reported that her pain improved with medication.  (AR 17-18.)  As such, Dr. Kim's treatment notes fail to support his conclusion that Plaintiff suffered from debilitating orthopedic conditions and limitations.

The record as a whole also fails to support Dr. Kim's finding of extreme limitations.  As the ALJ found, no "X-ray or other diagnostic studies describe a joint or vertebral disorder," and Plaintiff's "asserted inability to reach overhead is not demonstrated by any objective finding related to [her] neck or upper extremities."  (AR 17.)  Indeed, Plaintiff only once even claimed that she was hindered in her ability to reach overhead, in May 2010 (AR 244), and apparently did not mention it again in the many times she saw Dr. Kim after that.  The ALJ also correctly noted that Dr. Kim's findings of "lower extremity radiculopathy" were unsupported because all of Plaintiff's straight-leg-raising tests – which are used to detect nerve impingement – were negative.  (AR 18.)  Moreover, no other objective evidence supports Dr. Kim's finding of radiculopathy, and in fact in March 2010, Dr. Ram Chillar, who treated Plaintiff for thrombocytopenia, noted that her cranial nerves, motor

_____

[17]Dr. Kim's reliance on Plaintiff's subjective complaints is also suspect because, as discussed in the next section, the ALJ permissibly discounted Plaintiff's credibility.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's subjective complaints).

1  function, and sensation all appeared to be normal.  (AR 261.)
2  Indeed, despite diagnosing several orthopedic conditions and
3  finding that Plaintiff had significant functional limitations,
4  Dr. Kim apparently never ordered an MRI, x-ray, nerve conduction
5  study, or any other objective diagnostic testing to confirm any
6  of his diagnoses.  As such, the ALJ permissibly concluded that
7  the record does not support his assessment.  Plaintiff does not
8  even argue that the ALJ's reliance on this factor was in any way
9  improper.

10       The ALJ also noted that Dr. Kim's November 2010 opinion
11  conflicted with Plaintiff's own account of her daily activities.
12  (AR 18); see Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595,
13  601-02 (9th Cir. 1999) (finding ALJ permissibly rejected treating
14  physician's opinion in part because it was inconsistent with
15  claimaint's daily activities).  Plaintiff testified at the
16  February 2012 hearing that she went to the movies, and even
17  though she said she needed to sit by an aisle because she "cannot
18  sit and watch the whole movie through" (AR 32-33), as the ALJ
19  found, that still "suggests the capability for sitting in excess
20  of 15 minutes" (AR 18).  The ALJ also noted that Plaintiff's
21  statements in her May 3, 2010 function report showed "that she
22  can walk around a swap meet for one hour" and "sit for about 30
23  minutes," which "seemingly exceed[ed] [Dr. Kim's] assessed
24  restrictions for sitting or walking of only 15 minutes."  (AR 18
25  (citing AR 184, 188).)  Plaintiff argues that the ALJ's reliance
26  on her May 2010 report was improper because it predated Dr. Kim's
27  opinion by six months, and "the record clearly reflects that
28  Plaintiff's condition and symptoms are progressive and worsening

with the passage of time." (J. Stip. at 9.)  Dr. Kim's notes,
however, fail to show any significant worsening of her conditions
between May and November 2010.  (<u>Compare</u> AR 397-98 (May 2010,
noting complaints of "severe" back pain radiating to buttocks and
hip, antalgic gait on the right, tenderness in right sacroiliac
region, and positive Fabere sign), <u>with</u> AR 389-90 (November 2010,
noting complaints of back, right-hip, and leg pain, "slightly"
antalgic gait, tenderness in right sacroiliac region, and
positive Fabere test).  But even if Plaintiff's condition had
worsened (<u>see, e.g.</u>, AR 214 (Plaintiff describing increased pain
and symptoms as of August 2010)) and the ALJ's reliance on the
May 2010 report was in error, it was harmless because she
provided other specific and legitimate reasons for rejecting Dr.
Kim's opinion.  <u>See</u> <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d
1050, 1055 (9th Cir. 2006) (finding error harmless when "mistake
was nonprejudicial to the claimant or irrelevant to the ALJ's
ultimate disability conclusion"); <u>Howell v. Comm'r Soc. Sec.
Admin.</u>, 349 F. App'x 181, 184 (9th Cir. 2009) (finding ALJ's
erroneous finding harmless when he gave other clear and
convincing reasons for rejecting opinion of treating physician).

     The ALJ also discounted Dr. Kim's opinion of Plaintiff's
limitations because he provided only a "conservative level of
care." (AR 18); <u>see</u> <u>Rollins v. Massanari</u>, 261 F.3d 853,
856 (9th Cir. 2001) (holding that ALJ properly rejected opinion
of treating physician who prescribed conservative treatment yet
opined that claimant was disabled).  Dr. Kim treated Plaintiff's
allegedly debilitating orthopedic conditions primarily by
prescribing pain medication and a muscle relaxant and

1    recommending that Plaintiff use heat and a TENS unit and seek
2    chiropractic care.  Dr. Kim also prescribed lumbar epidural and
3    facet-block injections, although he had to postpone them
4    indefinitely after testing revealed that Plaintiff had a low
5    platelet count.  Dr. Kim never referred Plaintiff to pain
6    management or found that surgery would be warranted, even though
7    one of Plaintiff's treating physicians seemed to indicate that
8    Plaintiff could undergo an "invasive" treatment if she received a
9    platelet transfusion.  (See AR 261.)  Although Plaintiff does not
10   contend that the ALJ's reliance on this factor was erroneous
11   (see J. Stip. at 4-10), some cases have indicated that treatment
12   with epidural and other types of injections is not
13   "conservative."  See, e.g., Tagle v. Astrue, No. CV-11-7093-SP,
14   2012 WL 4364242, at *4 (C.D. Cal. Sept. 21, 2012) ("While
15   physical therapy and pain medication are conservative, epidural
16   and trigger point injections are not."); Christie v. Astrue, No.
17   CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011)
18   (refusing to characterize steroid, trigger-point, and epidural
19   injections as conservative).  Thus, this finding may have been in
20   error.  But even if the ALJ erred in relying on this factor, it
21   was harmless because she gave other specific and legitimate
22   reasons for discounting Dr. Kim's opinion.  See Stout, 454 F.3d
23   at 1055; Howell, 349 F. App'x at 184.

24        Finally, the ALJ permissibly relied on Dr. Haaland's opinion
25   instead of Dr. Kim's.  (AR 17-18.)  Before rendering his opinion,
26   Dr. Haaland reviewed many of Dr. Kim's treatment records and the
27   other evidence of record, including Plaintiff's laboratory
28   results and consultations with other doctors.  (See AR 307-10);

§ 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim, including opinions of treating and other examining sources").  As the ALJ noted, Dr. Haaland's assessment was "more consistent with, and better supported by, the evidence when considered in its entirety" (AR 18); indeed, as discussed, the record contained very little objective evidence of debilitating orthopedic conditions.  Dr. Haaland's opinion, moreover, was consistent with that of nonexamining physician Harar.  See § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227-28 (9th Cir. 2009) (upholding RFC determination when ALJ relied on state-agency physician's opinion over that of treating physician).  And although Plaintiff contends that the ALJ's reliance on Dr. Haaland's opinion was unwarranted because he was "not listed by the medical board of California as being board certified in any specialty" (J. Stip. at 9), Dr. Haaland's electronic signature in fact indicates that he, like Dr. Kim, specialized in orthopedics.  See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  As such, and

1  in addition to the reasons discussed above, the ALJ was entitled
2  to rely on Dr. Haaland's opinion to reject Dr. Kim's opinion.
3  See Morgan, 169 F.3d at 602 ("[W]e have consistently upheld the
4  Commissioner's rejection of the opinion of a treating or
5  examining physician, based in part on the testimony of a
6  nontreating, nonexamining medical advisor." (emphasis omitted)).
7      Remand is not warranted on this ground.
8      B.    The ALJ Properly Assessed Plaintiff's Credibility
9      Plaintiff contends that the ALJ failed to provide clear and
10 convincing reasons for discounting her credibility and "failed to
11 properly consider Plaintiff's consistent complaints of fatigue."
12 (J. Stip. at 17.)   As discussed below, however, the ALJ provided
13 clear and convincing reasons for discounting Plaintiff's
14 testimony to the extent it was inconsistent with an RFC for a
15 limited range of light work.
16     1.    Applicable law
17     An ALJ's assessment of symptom severity and claimant
18 credibility is entitled to "great weight."   See Weetman v.
19 Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779
20 F.2d 528, 531 (9th Cir. 1986).   "[T]he ALJ is not required to
21 believe every allegation of disabling pain, or else disability
22 benefits would be available for the asking, a result plainly
23 contrary to 42 U.S.C. § 423(d)(5)(A)."   Molina v. Astrue, 674
24 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks
25 omitted).   In evaluating a claimant's subjective symptom
26 testimony, the ALJ engages in a two-step analysis.   See
27 Lingenfelter, 504 F.3d at 1035-36.   "First, the ALJ must
28 determine whether the claimant has presented objective medical

evidence of an underlying impairment [that] could reasonably be
expected to produce the pain or other symptoms alleged." Id. at
1036 (internal quotation marks omitted).  If such objective
medical evidence exists, the ALJ may not reject a claimant's
testimony "simply because there is no showing that the impairment
can reasonably produce the *degree* of symptom alleged." Smolen,
80 F.3d at 1282 (emphasis in original).  When the ALJ finds a
claimant's subjective complaints not credible, the ALJ must make
specific findings that support the conclusion. See Berry v.
Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative
evidence of malingering, those findings must provide "clear and
convincing" reasons for rejecting the claimant's testimony.
Lester, 81 F.3d at 834.  If the ALJ's credibility finding is
supported by substantial evidence in the record, the reviewing
court "may not engage in second-guessing." Thomas, 278 F.3d at
959.

        2.  Relevant facts

     In a May 3, 2010 function report, Plaintiff wrote that she
had no problem with her personal care and could fix full meals
daily, although she had to "sit often while [she] d[id] this";
she could wash dishes if she took a break; and she could put
clothes in the washer, move them to the dryer, and fold them
while sitting down, although she needed someone to unload the
dryer and carry the laundry basket. (AR 186.)  Plaintiff shopped
in stores for groceries once a week for an hour or more. (AR
187.)  She enjoyed watching television, attending baseball games,
using the internet, and scrapbooking, but she needed to "get up
and move around after 1/2 hour"; she also attended swap meets,

although she couldn't walk around for more than an hour.  (AR 188.)  Plaintiff stated that she could not sit in a car for more than a half hour and could walk "maybe a block or two" before needing to sit for 5 to 10 minutes.  (AR 189.)

On June 17, 2010, Plaintiff submitted a "Disability Report – Appeal," stating that she was "now having trouble in [her] hip joints" and that "after sitting [she has] alot [sic] of trouble walking upon getting up."  (AR 204.)  She stated that "walking[,] sitting[,] or standing is even more unbearable now."  (Id.)  She listed the "approximate beginning date" of this new limitation as "[M]ay 2010."  (Id.)  In another, undated "Disability Report – Appeal," Plaintiff wrote that she was "now having problems in [her] right hip" and her platelet count was "not returning to normal and [she was] not able to get surgery on [her] back."  (AR 214.)  Plaintiff wrote that she had to "have [her] meds increased do [sic] to pain having worsened"; she was using a cane if she had to do any walking, such as in a grocery store; and she was "not able to stand to do dishes or any household chor[e]s."  (Id.)  Plaintiff also wrote that she now "need[ed] help getting out of bathtub."  (AR 217.)  Plaintiff wrote that the approximate beginning date of those limitations was August 12, 2010.  (AR 214.)

At the hearing on February 15, 2012, Plaintiff testified that she was able to prepare simple meals by microwaving food and fixing sandwiches.  (AR 31.)  She could dress and bathe herself, but she needed help getting in and out of the tub.  (Id.)  She did not mop, sweep, or vacuum; she could sort the laundry, put it in the washing machine, and fold it while sitting down, but she

needed her husband to move the laundry from the washer to the
dryer and carry the laundry basket.  (Id.)  Plaintiff went
grocery shopping with her husband for about half an hour once or
twice a month; her husband would get things off the shelf and put
them in the cart.  (AR 31-32.)  Plaintiff watched about five
hours of television a day.  (AR 32.)  She occasionally went to
movies but would sit by the aisle so she could get up and stand
because she "cannot sit and watch the whole movie through at
. . . a time."  (AR 32-33.)  Plaintiff testified that she could
not work because she could not be on her feet for more than 15 to
20 minutes, and if she was on her feet for a half hour, she was
"in a lot of pain."  (AR 34.)  She testified that her ability to
stand, bend, stoop, and lift was also limited; she could lift
only eight or nine pounds without experiencing significant pain.
(AR 34-35.)  Plaintiff testified that Vicodin made her drowsy and
she used a cane, which she said had been prescribed by Dr. Kim.
(AR 36-37.)

      3.  <u>Discussion</u>

    The ALJ found that Plaintiff's "medically determinable
impairments could reasonably be expected to cause the alleged
symptoms" but that her "statements concerning the intensity,
persistence and limiting effects of these symptoms are not
credible to the extent they are inconsistent with" Plaintiff's
RFC for a limited range of light work.  (AR 16.)  Reversal is not
warranted based on the ALJ's alleged failure to properly consider
Plaintiff's subjective symptoms.

    As an initial matter, the ALJ accommodated many of
Plaintiff's subjective complaints by formulating an RFC for only

31

a limited range of light work.  The ALJ noted that Plaintiff's "allegations as to her back pain being aggravated by prolonged sitting, standing and walking" were accommodated by an RFC requirement that she be allowed to "alternate positions hourly for a few minutes at the workstation," and her alleged need to use a cane was "accommodated by the allowance for use of a cane for prolonged walking or walking on uneven or moving surfaces." (AR 18.)  To the extent the ALJ rejected Plaintiff's contentions, moreover, she provided clear and convincing reasons for doing so.

The ALJ was entitled to discount Plaintiff's credibility because her complaints were inconsistent with the medical record. See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"). Specifically, the ALJ noted that "the objective findings as reflected in [Dr. Kim's] examination findings are generally mild and limited primarily to subjective tenderness and diminished range of motion" and that Dr. Kim found Plaintiff to be "full weight bearing" with "a normal balance and no gross muscle weakness." (AR 17.)  Such mild findings are inconsistent with Plaintiff's allegedly significant limitations, such as an inability to be on her feet for more than 15 to 20 minutes or lift more than nine pounds.  The ALJ also accurately noted that "while [Plaintiff] testified to bothersome side effects causing drowsiness, those complaints are not reflected in the clinical treatment notes, particularly from Dr. Kim." (AR 18; see also AR

32

36 (Plaintiff's testimony that Vicodin made her drowsy)); see
Thomas, 278 F.3d at 960 (ALJ permissibly discounted testimony
regarding side effects when plaintiff "offer[ed] no objective
evidence that her medications affected her concentration or
caused dizziness"); Morillas v. Astrue, 371 F. App'x 880, 883
(9th Cir. 2010) (ALJ reasonably discounted testimony about the
side effects of medications when "[n]othing in the medical
records reflected any complaint to her health providers that her
medications made her drowsy, and there was no evidence of any
assessed functional limitation from her medications").  The ALJ
also noted (AR 18) that although Plaintiff alleged disability
based in part on her thrombocytopenia (see AR 171), the medical
evidence reflects that her condition was stable and "modest" and
required no therapy (see AR 261 (noting "modest thrombocytopenia
with minimal evidence of bleeding" and recommending "no therapy
at this level[]"), 370 (noting "[c]hronic low-grade
thrombocytopenia" that was "stable")).

     Plaintiff does not point to any evidence that is consistent
with her asserted symptoms but instead contends only that an ALJ
"may not discredit a claimant's testimony as to the severity of
symptoms simply because they are unsupported by objective medical
evidence." (J. Stip. at 19.)  It is true that an ALJ may not
disregard a claimant's subjective-symptom testimony "*solely*
because it is not substantiated affirmatively by objective
medical evidence."  Robbins, 466 F.3d at 883 (emphasis added);
see also Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.
1991).  The ALJ may, however, use the medical evidence in the
record as one factor in the evaluation.  See Burch v. Barnhart,

400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); accord Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir. 2009).  Here, as explained below, the ALJ's credibility determination was supported by at least one other clear and convincing reason; thus, there was no error.

As the ALJ noted (AR 18), Plaintiff testified that Dr. Kim had prescribed a cane (AR 36-37), but treatment notes do not reflect any such prescription and instead show that she had simply started using her husband's cane (AR 391).  The ALJ also noted (AR 16) that Plaintiff reported suffering from back pain since 1986 (AR 260) but nevertheless worked "solidly" until 2009 (see AR 165-66).  The ALJ was entitled to rely on such inconsistencies to discount Plaintiff's credibility.  See Smolen, 80 F.3d at 1284 (in assessing credibility, ALJ may use "ordinary techniques of credibility evaluation," such as "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"); accord Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); cf. Gregory v. Bowen, 844 F.2d 664, 667 (9th Cir. 1988) (ALJ permissibly discounted claimant's credibility when "substantial evidence indicated that the condition of [plaintiff's] back had remained constant for a number of years and that her back problems had not prevented her from working over that time").

The ALJ also noted (AR 18) that Plaintiff stated in her March 2010 function report that she could fix full meals, attend baseball games, and walk around a swap meet for up to an hour (AR

34

188), which "show[ed] a greater level of functioning" than her later testimony at the hearing that she could, for example, be on her feet for only 15 to 20 minutes (AR 34).  Plaintiff contends that "the record clearly reflects that Plaintiff's condition and symptoms are progressive and worsening" and the May 2010 function report therefore "should not be used to attack her testimony rendered in February of 2012."  (J. Stip. at 9.)  But Plaintiff's May 2010 report, which was completed nearly a year after her claimed onset date, nevertheless indicates a level of activity inconsistent with her alleged total disability.  See Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").  In any event, even if the ALJ erred by relying on this factor, it was harmless because she gave other clear and convincing reasons for discounting Plaintiff's credibility.  See Carmickle, 533 F.3d at 1162 (when ALJ provides specific reasons for discounting Plaintiff's credibility, decision may be upheld even if certain reasons were invalid as long as "remaining reasoning and ultimate credibility determination" were supported by substantial evidence (emphasis omitted)).

     Finally, Plaintiff contends that the ALJ "failed to properly consider Plaintiff's consistent complaints of fatigue, which have been attributed by at least one treating physician as possibly due to her hypothyroid condition."  (J. Stip. at 17.)  Plaintiff, however, does not point to any evidence that a doctor ever actually diagnosed her with hypothyroidism, as opposed to

simply noting that it was a possible explanation for her reported fatigue.  (See id. (citing AR 260 (Dr. Chillar's note that Plaintiff "remains inactive, fatigued and tired but it may be because of underactive thyroid"), 303 (Dr. Ghaleb A. Saab's note that Plaintiff suffered from "[f]atigue and tiredness of a few months' duration, etiology?"), 356 (Dr. Saab's note that Plaintiff reported feeling "more fatigue than usual over the last few months"), 379 (Dr. Kim's note of "[h]ypothyroidism, by history")).)  Moreover, Plaintiff never alleged that she was unable to work because of fatigue or hypothyroidism, even when given the opportunity to list any "new" conditions; rather, she consistently asserted that she was disabled because of her orthopedic problems and resulting pain.  (See, e.g., AR 34, 171, 204, 214.)  And as discussed above, the ALJ made "findings sufficiently specific to permit the court to conclude that [she] did not arbitrarily discredit claimant's testimony."  See Thomas, 278 F.3d at 958; id. at 959 (ALJ permissibly inferred that claimant's "lack of candor" regarding drug use "carries over to her description of physical pain" (internal quotation marks omitted)).  The ALJ was not required to do more.

Plaintiff is not entitled to remand on this ground.

**VI.  CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[18] IT IS ORDERED that judgment be entered

---

[18]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

1  AFFIRMING the decision of the Commissioner and dismissing this

2  action with prejudice.   IT IS FURTHER ORDERED that the Clerk

3  serve copies of this Order and the Judgment on counsel for both

4  parties.

5

6

7  DATED: August 13, 2014

8                                           JEAN ROSENBLUTH
                                            U.S. Magistrate Judge
9

37